UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

ROYAL SURPLUS LINES INSURANCE
COMPANY,

      Plaintiff,

VS                                              CASE NO. 3:03CV419-RS

DELTA HEALTH GROUP, INC.,

      Defendant.

**ORDER**

Before the Court are cross-motions of summary judgment (Docs. 55 and 88) and the parties' subsequent responses (Docs. 88 and 94). Since virtually all of the issues discussed in the motions are related to one another, the Court will address both motions for summary judgment in this order. After due consideration, the plaintiff's motion for summary judgment is granted in part and the defendant's motion is denied.

*I. Undisputed Facts of the Case*

Royal Surplus Insurance Company (Royal) provided insurance to Delta Health Group (Delta) from November 1, 1998 until December 31, 2000. Delta purchased two types of insurance from Royal Surplus Lines, primary general liability and an excess or umbrella policy.[1]

---

[1] Excess coverage (or umbrella coverage) provides coverage over and above primary insurance limits. It is, in essence, an insurance policy for an insurance policy, providing an extra layer of protection for the insured.

Entered On Docket: _____ By: _____
Rules 58 & 79(a) FRCP or 32(d)(1) & 55 FRCRP
Copies mailed to: _____

Document No.

Royal issued two primary policies[2] (Royal Primary) and two umbrella policies (RU 1 and RU 2) to Delta during this time period.[3]  For the purposes of this order, RU 2 is the relevant umbrella policy. The terms of RU 2 required Delta to maintain a minimum schedule of underlying insurance. Specifically, with respect to professional and general liability insurance, RU 2 required Delta to carry a minimum underlying insurance of  $1,000,000/ per occurrence and $3,000,000 aggregate/per location. Also, under RU 2, Delta would be required to pay a retained limit "with respect to any "occurrence" that was <u>not covered</u> by "underlying insurance" or any other insurance.[4]

On January 19, 2000, Royal sent a letter to Delta indicating that it would not renew Royal Primary and as a result, the policy would expire at 12:01 AM on April 17, 2000.[5]  Due to the different ending dates for primary and umbrella policies, Delta was forced to find another insurance company to provide underlying insurance coverage in order to ensure continued compliance with the terms of the RU 2.[6]  Subsequently, Delta contracted with Lexington Insurance to provide primary underlying coverage (Lexington Primary) which would immediately replace Royal Primary upon the expiration of the Royal Primary policy on April 17, 2000. The coverage provided by Lexington Primary (i.e. $1million/occurrence and $3

---

[2] For the purposes of this judgment, the relevant primary policies issued by Royal covered professional liability and general commercial liability.

[3] RU 1 ran from 11/1/98-11/1/99 while RU 2 ran from 11/1/99-12/31/00.

[4] The contract defined "retained limit" as a) "With respect to any occurrence that is covered by "underlying insurance" or any other insurance, the total of the applicable limits of the "underlying insurance" shown on the declarations page plus the applicable limits of any other insurance collectible by the insured; or b) With respect to any "occurrence" that is not covered by "underlying insurance" or any other insurance, the amount stated in Item 4 of the declarations as the Retained Limit/Each Occurrence.

[5] For reasons that are unclear, Royal also sent a second notice of non-renewal to Delta on February 10, 2000.

[6] Royal primary ended on 04/17/00 while Royal Umbrella 2 was scheduled to end on 12/31/00.

million/aggregate) did not meet the minimum amount required under the RU 2 policy for underlying general and professional liability insurance.[7]

Since the coverage provided by Lexington Primary did not meet the requirements for professional and general liability underlying insurance set out in the umbrella contract, both parties agree that Delta was in breach of RU 2 as of April 17, 2000, the date that Royal Primary ended and Lexington Primary was activated. Consequently, on May 2, 2000, Royal sent Delta a Notice of Cancellation with respect to RU 2, effective June 19, 2000. Royal stated that the reason for the cancellation was "a significant change in the risk covered by this policy." In order to avoid cancellation of the umbrella policy, Delta entered into negotiations with Royal. As a result of the negotiations, the parties agreed to amend RU 2, effective June 19, 2000 and continuing through December 31, 2000.[8] In short, the endorsements incorporated into RU 2 resulted in three substantive changes to the original contract: 1) An increased premium; 2) A decrease in umbrella coverage (from $20 million/occurrence, $20 million aggregate where

---

[7] As stated above, RU2 required that Delta maintain a schedule of underlying insurance of at least $1 million/per occurrence and $3 million/per location aggregate (with respect to general and professional liability) with the costs of defense outside the limits of liability.

[8] There were three important endorsements agreed upon by Royal and Delta in amending RU 2. The following two endorsements are set out in full due to their particular importance:

**Endorsement No. 15**: It is agreed that the limits of liability shown in item 4 of the Declarations are amended to read as follows:
$10,000,000 Each Occurrence
$10,000,000 Aggregate Where Applicable

**Endorsement No. 16:** Effective 06/19/00, the Schedule of Underlying Insurance for General Liability and Professional Liability is amended to read as follows:

1. Lexington Insurance Company
    $1,000,000 Per Occurrence
    $3,000,000 Aggregate
    with limits to be eroded by indemnity payments

2. In the event of exhaustion of the aggregate limit shown in # 1 above, the insured will retain the next $ 1,000,000 per occurrence. The insured will also retain all defense costs incurred in this layer.

3

applicable to $10 million/occurrence, $10 million aggregate where applicable); 3) A decrease in the amount of underlying insurance required (equal to the amount provided by Lexington Primary) by RU 2 and the inclusion of a Self-Insured Retention (SIR) of $1 million/occurrence in the event that the coverage provided by Lexington Primary was exhausted.

Thus, until the expiration of Royal Primary on April 17, 2000, Delta and Royal were in compliance with the terms of RU 2. However, between April 17, 2000 (the date when Royal Primary expired) and June 19, 2000 (the date Royal and Delta agreed to amend RU 2)[9], Delta failed to maintain the necessary amount of underlying insurance.  Finally, from June 19, 2000 until the expiration of RU 2 on December 31, 2000, the relationship between Delta and Royal was controlled, in theory, by the amended RU 2.

In a nutshell, the parties' motions for summary judgment concern the allocation of coverage responsibility during the "gap period" and post-gap period. The Court's primary goal is to determine if, as a matter of law, RU 2 is to be interpreted in a manner consistent with either Delta or Royal's motions for summary judgment. However, before addressing the specific claims made by each party in their motions for summary judgment, the Court will outline the legal principles relevant to this case.

## II. Standard of Summary Judgment

Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file and affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); Fed.R.Civ.P. 56(c). All the relevant facts in a motion for summary judgment are construed in the manner most favorable to the non-movant. However, the non-moving party must provide more than a "metaphysical doubt" as to the important facts in the case. Matsushita Electric Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). In other words, the non-moving party must make a sufficient showing on each essential element of the case for which he has the burden of proof. Celotex, 477 U.S. at 323, 106 S.Ct. 2552.

---

[9] The Court will refer to the period between April 17, 2000 and June 19, 2000 as the "gap period."

*III. Applicable Substantive Law*

The Court has diversity jurisdiction over the parties.  In diversity cases, a federal court must apply state law if the law is substantive in nature. Erie R.R. v. Tompkins, 304 U.S. 64, 76-78 (1938). Since the case was filed in Florida, the Court will turn to Florida contract law. In Florida, the doctrine of *lex locus contractus*[10] determines which state law will apply to the construction of a contract if there is not a choice of law provision in the contract itself. Fioretti v. Massachusetts General Life Insurance Co., 53 F.3d 1228, 1235 (11th Cir. 1995)(stating that in resolving conflict of law issues with respect to contracts, the Florida Supreme Court has chosen to abide by the traditional rule of *lex loci contractus*).  The last act necessary to complete the contract (i.e. the delivery of the contract to Delta) occurred in Florida, and as a result, Florida contract law will guide the interpretation and construction of the contract in question.

According to the Florida Supreme Court, "an insurance contract is to be construed in accordance with the plain language of the policy." Siegle v. Progressive Consumer Insurance Co., 819 So.2d 732, 735 (Fla. 2002); see also Golden Door Jewelry Creations, Inc., v. Lloyds Underwriters Non-Marine Association, 117 F.3d 1328, 1337 (11th Cir. 1997)(stating that "a court must first examine the natural and plain meaning of a policy's language")  quoting Key v. Allstate Ins. Co., 90 F.3d 1546, 1548-49 (11th Cir. 1996). However, under Florida law, if the Court determines that the language of the policy is ambiguous, the Court will resolve the ambiguity in favor of the insured.  Id. at 735. The obvious corollary to this legal maxim is that if the Court does not find any ambiguity in the contract, the policy will be construed as written. Id. The Court will now turn to the specific claims made in each of the parties' respective motions.

*IV. Delta's claims for summary judgment*

Delta's motion for summary judgment asks the Court to issue two declaratory judgments in its favor. First, Delta claims that Royal "failed to reserve its rights" in accordance with Florida's Claims Administration Statute, and as such, Royal has "waived all conditions of

---

[10] *Lex locus contractus* is accurately described as follows:  " in the absence of a contractual provision specifying the governing law, a contract (other than one for the performance of services) is governed by the law of the state in which the contract is made, i.e. where the last act necessary to complete the contract is done." Fioretti v. Massachusetts General Life Insurance Co., 53 F.3d 1228, 1235 (11th Cir. 1995).

5

coverage." Second, Delta alleges that RU 2 is written in an ambiguous manner, particularly with respect to the definition of "retained limit," and as a result, the ambiguity should be construed in a manner favorable to the insured. The Court will discuss each of these claims in further detail.

A.  Royal failed to reserve its rights properly or timely in accordance with Fla. Stat. § 627.426[11] - i.e. Florida's Claims Administration Statute (FCAS).

Royal contends that Condition 17 (see below) of RU 2 requires that Delta is responsible for fulfilling the underlying insurance requirements imposed by RU 2 during the "gap period" (i.e. 04/17/00-06/19/00)[12] before the umbrella coverage is triggered.  Royal contends that Delta is required to step in and cover the gap between the coverage provided by Lexington Primary and the coverage formerly provided by Royal Primary before the umbrella policy is triggered. Delta argues that in order for Royal to rely on the requirements imposed by Condition 17 of RU 2, Royal must fulfill the requirements imposed by Fla. Stat. § 627.426 (2). Under FCAS, a liability insurer (e.g. Royal) cannot deny coverage based on a coverage defense unless it notifies the insured (e.g. Delta) of the coverage defense "within 30 days after the liability insurer knew or should have known of the coverage defense."  Ultimately, the crux of Delta's claims and Royal's response depends on the Court's construction of Condition 17 in RU 2 and whether it is a "coverage defense." Due to its importance, the Court quotes the relevant aspects of this provision in full below:

---

[11] The relevant part of Fla. Stat. § 627.426 states as follows:

(2) A liability insurer shall not be permitted to deny coverage based on a particular coverage defense unless:

(a) Within 30 days after the liability insurer knew or should have known of the coverage defense, written notice of reservation of rights to assert a coverage defense is given to the named insured by registered or certified mail sent to the last known address of the insured or by hand delivery...

[12] The "gap period" commenced on 04/17/00 with the replacement of Royal Primary by Lexington Primary.

6

17. Maintenance of "Underlying Insurance"

    (a) You agree to maintain the "underlying insurance" in full force and effect during the term of this policy, and to inform us within 30 days of any replacement or material change of that "underlying insurance" by the same or another company. If you do not maintain the "underlying insurance" in full force and effect or fail to meet all conditions and warranties of such "underlying insurance", this policy shall apply as if those policies were available and collectible.

    (c) No statement contained in this condition limits our right to cancel or not renew this policy.

    For purposes of this policy,

        (a) If any "underlying insurance" is not available or collectible because of:

            (i) The bankruptcy or insolvency of the underlying insurer(s) providing such "underlying insurance"; or

            (ii) The inability or failure for any other reason of such underlying insurer(s) to comply with any of the obligations of this policy; or

        (b) If the "retained limit" is not available or collectible because of:

            (i) The bankruptcy or insolvency of the Named Insured; or

            (ii) The inability or failure for any other reason of the Named Insured to comply with the provisions of this policy,

    Then this policy shall apply (and amounts payable hereunder shall be determined) as if such "underlying insurance" or "retained limit" were available and collectible.

Delta maintains that Condition 17 is not a grant of coverage or an exclusion of coverage; rather, it is a <u>condition of coverage</u> and as such, Royal must comply with the FCAS. According to Royal, Royal has not denied coverage, but rather "asserted that its coverage is not triggered until certain conditions are met." Royal states that Condition 17 is a "self-executing clause" and holds that Royal's attachment point will not change if for any reason Delta fails to maintain the Schedule of Underlying Limits. In short, Royal argues that this case is not about utilizing a coverage defense to justify a denial of coverage but rather <u>when</u> Royal's coverage comes into play. Obviously, the key to this issue is defining the term "coverage defense" and whether Condition 17 of RU 2 falls within the definition of a "coverage defense." Both parties cite to the

7

Florida Supreme Court case <u>AIU Insurance Company v. Block Marina Investment, Inc.</u>, 544 So.2d 998 (Fla. 1989), in support of their respective positions. In <u>AIU Insurance</u>, the Florida Supreme Court defined a "coverage defense" under FCAS:

> Therefore, we hold that the term "coverage defense," as used in section 627.426(2), means a defense to *coverage that otherwise exists*. We do not construe the term to include a disclaimer of liability based on a complete lack of coverage for the loss sustained. Under this construction for example, if the insurer fails to comply with the requirements of the statute, it may not declare a forfeiture of coverage which otherwise exists based on a breach of a condition of the policy. However, its failure to comply with the requirements of the statute will not bar an insurer from disclaiming liability where a policy or endorsement has expired or where the coverage sought is expressly excluded or otherwise unavailable under the policy of existing law.

Id. at 1000 (emphasis added).

If Condition 17 were to be interpreted as a coverage defense, it would provide Delta with coverage that it is not entitled to under the explicit terms of Condition 17 and in direct contravention to the guidelines laid out in <u>AIU</u>. The Court finds that Condition 17 is written in an unambiguous and straightforward manner. Finding no ambiguity in Condition 17, the Court reads the provision in the plain manner in which it is written. In short, Condition 17 indicates <u>when</u> Royals' umbrella policy will be triggered. Condition 17 states that the insured (i.e. Delta) will be fully responsible for maintaining the underlying insurance in "full force and effect" even if the underlying insurance and/or retained limit is not "available or collectible." Thus, even if the primary insurer were to become insolvent, Royal's position vis a vis its attachment point[13] would be unaffected. Indeed, if the Court were to interpret Condition 17 as a coverage defense, it would reward Delta for breaching RU 2. Thus, for purposes of FCAS, and per the mandates of <u>AIU</u>, Condition 17 is not a coverage defense, and as such, Royal was not required to adhere to the Florida Claims Administration Statute as a matter of law.

---

[13] "Attachment point" is a synonym for "trigger point."

B. <u>RU 1 and RU 2 are ambiguous when read *in pari materia* with the definition of "retained limit" and the provisions of Condition 17, and therefore Delta is entitled to liberal construction in its favor.</u>

Delta claims that when the Insuring Agreement is read *in pari materia* with the definition of "retained limit" and Condition 17, there are "at least two reasonable interpretations" that result during the "gap period." The term "retained limit" is defined in RU 2 as follows:

> 11. "Retained limit" means:
>
> (a) With respect to any "occurrence" that is covered by "underlying insurance" or any other insurance, the total of the applicable limits of the "underlying insurance" shown on the declarations page[14] plus the applicable limits of any other insurance collectible by the insured;
>
> (b) With respect to any occurrence that is not covered by "underlying insurance" or any insurance, the amount stated in Item 4 of the declarations as the Retained Limit/Each Occurrence

According to Delta, one reasonable interpretation is that the umbrella policy is not triggered until the retained limit of $ 3million/aggregate per location is reached. Another reasonable construction (the "alternative construction") is that upon the exhaustion of Lexington Primary, Delta would only be responsible for paying $10,000 per occurrence thereafter before the umbrella policy was triggered. Delta justifies this alternative construction as follows: First, Delta looks to RU 2 provision I (1), titled "Insuring Agreement," which states that Royal "will pay on behalf of the insured those sums in excess of the <u>retained limit</u> which the insured becomes legally obligated to pay as damages..." Delta links I(1) to the definition of "retained limit" above, concluding that when those provisions are read together, a reasonable interpretation is that once the Lexington policy was exhausted, any additional occurrences were not <u>covered</u> by either "underlying insurance" or "any other insurance." Therefore, since no further occurrences would be <u>covered</u>, 11(b) mandates that Delta's sole responsibility is to pay the amount stated in Item 4 of the declaration (i.e. $10,000) before the umbrella policy is

---

[14] i.e. in the original RU 2, $1 million/occurrence and $3 million/aggregate per location and in "amended" RU 2 (post 06/19/00), $1 million/occurrence and $ 3 million/aggregate.

9

triggered. Delta contends that Condition 17, which seems to be the controlling provision with respect to when the umbrella policy is triggered, creates ambiguity by using the phrase "available and collectible" when referring to the underlying insurance, while the definition of retained limit uses the phrase "occurrence that is covered" in reference to the underlying insurance.

Royal counters Delta's arguments by stating that the effect of Delta's alternative construction is to "convert a claim which is 'covered' by underlying insurance to one which is 'uncovered' by underlying insurance upon the exhaustion of the Lexington policy." Also, Royal states that if a claim is covered, it is covered regardless of whether the underlying insurance has been exhausted and that Delta's alternative interpretation would render Condition 17 "utterly meaningless."

The Court ultimately finds that there is no ambiguity with respect to the meaning of "retained limit" and when the "retained limit" is reached. Accepting Delta's definition of "covered" and taking it to its logical conclusion, Delta's alternative construction would reward Delta for breaching the contract. Indeed, if this were to be the case, Delta would have been better off simply getting rid of the underlying coverage altogether (thus saving the underlying deductible/occurrence) at the beginning of the contract and paying the $10,000/per occurrence retained limit because nothing would have been "covered." It is clear to the Court that 11(b) must be read in the context of 11(a) because they are complementary provisions. 11(a) states that if an occurrence is <u>covered</u> by "underlying insurance" (e.g. primary insurance), the retained limit is the total of the applicable limits of the "underlying insurance" shown on the declarations page plus any other insurance collectible by the insured. The word "covered" in the context of defining "retained limit" is wholly independent of whether the actual underlying limit is exhausted. Thus, for example, if there was a general liability claim against Delta, 11(a) would kick in because such a claim is "covered" by underlying insurance. Per Condition 17 (see above), even if the underlying insurer did not pay the full amount required by RU 2, the claim would still be "covered" per the defined meaning of "retained limit" and the umbrella would not "open" until that retained limit was met.

Furthermore, the Court reads 11(b) to mean that for any claims not within the coverage mandates of the Schedule of Underlying Insurance(as required by RU 2), the insured (i.e. Delta) is responsible for paying the "Retained Limit/Each Occurrence" stated in Item 4 of the

declarations, which was $10,000 under RU 2. An "occurrence not covered" in this context simply means that Delta would have had to pay Royal $10,000 for each occurrence that was not within the substantive ambit (i.e not covered) of any of the underlying insurance policies listed in the Schedule of Underlying Insurance before RU 2 was triggered. This is the only logical interpretation of the contract because an umbrella policy is meant to be fully comprehensive, and as such, there are certain risks that an umbrella insurer will require an insured to maintain a specified amount of underlying liability (e.g. professional and general liability) for, and that is precisely what has transpired in this case.  Also, as Royal correctly point out, the language in Condition 17 could have been amended to use the word "covered" instead of "available and collectible." However, Royal's reason for using such language (e.g. to protect itself against the primary insurer's insolvency) is logical and their choice to use different language does not leave the Court confused as to the plain meaning intended by the parties.  Thus, for the reasons stated above, the Court finds the definition of retained limit, when read in the context of RU 2 and Condition 17, to be unambiguous as a matter of law and Delta's motion for summary judgment is denied.

V. *Royal's Motion for Summary Judgment*

In Royal's motion for summary judgment, Royal asks the Court to enter declaratory judgment in its favor on five enumerated issues. The Court addresses each in turn:

A. <u>Delta breached its obligations under RU 2 by failing to maintain the underlying insurance required by RU 2 and as a result, Delta is responsible for defending and paying any claims falling within the gap in coverage during the gap period  (i.e. 4/17/00-6/19/00).</u>

Royal claims that unless Delta and/or Lexington pay out a total of $ 3 million/aggregate per location for losses in the "gap period",[15] Royal is not required to "drop down" and defend or indemnify Delta against any claims covered by underlying insurance. Delta's defense to this

---

[15] In order to equal the minimum underlying insurance required by RU 2 and specifically  by Condition 17.

11

contention is that Royal has not complied with FCAS. Since the Court has already held that statute to be inapplicable to this particular case,[16] Delta's defense obviously fails.

Consequently, the Court finds, as a matter of law, that Delta breached its obligations under RU 2 by failing to maintain the required underlying insurance during the "gap period." As a result, the Court agrees with Royal that Delta is responsible for making up any difference between the coverage provided by Lexington Primary and Royal Primary during the "gap period" for covered claims. Also, the Court finds that the majority of case law holds that an underlying insurer has no duty to drop down and defend or indemnify the insured if the contract does not provide for such coverage. See e.g. National Union Fire Insurance Company v. Travelers Insurance Company, 214 F.3d 1269 (11th Cir. 2000); see also 1 Couch on Insurance § 6:38 (3d. ed. 2005).  Since there is nothing in RU 2 that requires Royal to drop down and defend or indemnify Delta if the underlying insurance requirements are not met, the Court finds that Royal did not have a duty to drop down and defend or indemnify Delta at any point. Based on these conclusions (and for the sake of clarity),  the Court finds that the underlying coverage provided by Delta + Lexington Primary (as a single entity) must equal $ 3 million per location (per Condition 17 in RU 2) before the umbrella policy is triggered. Thus, Delta is responsible for defending and  paying any gap in the underlying coverage during the "gap period" before Royal's umbrella coverage becomes relevant.

B. <u>If Delta did not satisfy its obligations pursuant to the $ 1 million self insured retention, plus defense costs (see Endorsement 16),  Royal has no duty or obligation to drop down and provide indemnity or defense to Delta within the $ 1million SIR plus defense costs for the period between 6/19/00-12/31/00.</u>

Delta's primary defense to this claim is that the mid-term cancellation of RU 2 was improper. On May 2, 2000, Royal sent a notice of cancellation to Delta  with respect to RU 2, effective June 19, 2000.  The relevant statute in this situation is Fla. Stat. § 627.4133 which states that an insurance policy may be canceled after the policy has been in effect for 90 days for " a failure to comply with underwriting requirements established by the insurer within 90 days of

---

[16] In short, this was due to the fact that Condition 17 is not a defense, but rather an explication of the "trigger point" for the policy.

coverage, or a substantial change in the risk covered by the policy..." In Royal's Notice of Cancellation to Delta on May 2, 2000, Royal's stated reason for cancellation was "a significant change in the risk covered by this policy." With respect to Fla. Stat. § 627.4133, the parties dispute whether there truly was a "substantial change in risk covered by the policy," thus justifying Royal's decision to cancel the umbrella policy. Royal states that the decrease in the amount of coverage provided by Lexington Primary substantially increased the risk to Royal. Royal's underwriter also claims that the fact that a non-insurance company (i.e. Delta) was to play an important role in resolving claims also led to an increase in risk. Delta sets out a number of reasons why it believes that Royal has improperly cancelled the policy, including bad faith and lack of due diligence on the part of Royal's underwriters with respect to investigating Delta's financial condition and its ability to handle claims.[17]

Ultimately, the Court finds that the determinative issue is whether the replacement of the Royal Primary with Lexington Primary resulted in a substantial change in risk that no reasonable person could dispute. The Court finds the fact that Delta's primary insurance went down from $3 million/aggregate per location to $3 million/aggregate to be a substantial change in the risk covered by Royal as a matter of law. Also, the Court notes the fact that since Royal was no longer the primary carrier, there was an increase in the uncertainty and risk posed to Royal and the coverage of its umbrella policy. Thus, the Court finds that as a matter of law, the risk to Royal did increase substantially upon the replacement of Royal Primary with Lexington Primary, and as such, the Notice of Cancellation sent to Delta was proper.

The Court also finds that the Endorsements entered into by the parties were the result of an arms length transaction, and were agreed to based on the increased risk to Royal. Finally, the Court, consistent with the majority of case law, finds that Royal did not have a duty to drop down and defend or indemnify Delta for any claims during this period until the Lexington policy

---

[17] Delta also claims that Royal's actions violated Florida's Unfair Insurance Trade Practices Act (Fla. Stat. § 626.9541(1)(o)(7)) because it essentially reissued a similar coverage to Delta with a higher premium. The Court finds it to be quite obvious that the amended RU 2 was substantively different from the original RU 2 in a number of ways (e.g. the inclusion of a $1 million SIR, the inclusion of lower underlying insurance, etc.) and as a result, Delta's claim fails.

+ SIR + defense costs were met.[18] Indeed, Delta's agreement to take on the $1 million SIR was a business decision made by them, in a manner analogous to Royal's decision to sign the Endorsements. Per the explicit terms of the amended contract, and specifically condition 17, the fact that Delta cannot pay the SIR is of no relevance with respect to Royal's duties. The Court will enforce the plain terms of the contract. As such, the Court grants the second part of Royal's motion for summary judgment.

C. If Delta does not pay the $ 1 million SIR plus defense costs, Royal can set-off $ 1 million per occurrence from any judgment or settlement in excess of $ 1million per occurrence during the period 06/19/00-12/31/00 for which Royal has an obligation under RU 2 to indemnify Delta.

Based on the previous discussion, the Court grants the third part of Royal's motion for summary judgment.

D. Endorsement 15 provides limits of $10 million per occurrence, and $10 million aggregate for damages alleged triggering the period 06/19/00-12/31/00.

The Court finds that the language in Endorsement 15 is clear and unambiguous. Furthermore, there is nothing in the record to indicate that Royal forced Delta to sign any of the Endorsements under any conditions of duress. Indeed, there was nothing to prevent Delta from allowing RU 2 to terminate and simply looking to other insurance companies to find coverage equivalent to that provided by RU 2. It is logical to conclude that the only reason Delta agreed to the amended version of RU 2 was that it was the best alternative Delta had for excess insurance purposes. Thus, the Court grants the fourth part of Royal's motion for summary judgment.

E. Delta must reimburse any amounts paid by Royal that are deemed to fall within Delta's $ 1 million obligation pursuant to its contractual breach and/or SIR.

Delta claims that since Royal does not present specific evidence as to the reimbursement issue, the Court should deny Royal's claim. Pursuant to the Declaratory Judgment Act (Act), 28

---

[18] It is of no consequence that the SIR is not provided by an insurance company per se, but rather a health company who also happens to be the insured. For purposes of triggering the umbrella policy, Delta was in essence, another "layer" of protection for Royal prior to the triggering of the umbrella policy.

USC § 2201 (a),[19] the party asking for a declaratory judgment must allege facts that demonstrate to the Court that there is an "actual controversy" between the parties. According to the 11th Circuit, the "controversy may not be conjectural, hypothetical, or contingent; it must be real and immediate, and create a definite, rather than speculative threat of future injury." Emory v. Peeler, 756 F.2d 1547, 1552 (11th. Cir. 1985). Also, the Act provides the Court with "unique and substantial discretion in deciding whether to declare the rights of litigants." Wilton v. Seven Falls Company, 515 U.S. 277, 286, 115 S.Ct.2137, 132 L.Ed.2d. 214 (1995).

The Court finds that the key to this issue is that Royal has made an allegation for which it provides no factual support. Consequently, since there is no factual foundation for the claim made by Royal, the Court finds that Royal's claim is simply a hypothesis at this point. Thus, the Court denies the fifth part of Royal's motion for summary judgment.

IT IS ORDERED:

    1. Royal's motion for summary judgment is granted as to issues A-D.

    2. Royal's motion for summary judgment is denied as to issue E.

    3. Delta's motion for summary judgment is denied.

ORDERED on January 23, 2006.

/s/ Richard Smoak
RICHARD SMOAK
UNITED STATES DISTRICT JUDGE

---

[19] The relevant part of 28 USC § 2201 is stated below:

(a) In a case of actual controversy within its jurisdiction,...any court of the United States,...may declare the rights and other legal relations of any interested party seeking such declaration,...